WILLARD PEASE OIL AND GAS COM-
PANY, a Nevada corporation, and W.
Don Quigley, an individual, Plaintiffs
and Appellants,

v.

PIONEER OIL AND GAS COMPANY,
a Utah corporation, Defendant and
Appellee.

No. 940188.

Supreme Court of Utah.

June 29, 1995.

Thomas W. Bachtell, John F. Waldo, Brent A. Bohman, Salt Lake City, for plaintiffs.

Stephen J. Hill, Gregg B. Colton, Salt Lake City, for defendant.

STEWART, Associate Chief Justice:

Plaintiffs Willard Pease Oil and Gas Company and W. Don Quigley appeal the district court's ruling that they are not entitled to their share of proceeds from a well until defendant Pioneer Oil and Gas Company has recovered 300% of the cost of drilling the well that is chargeable to their interest. The issues before this Court are whether Pease and Quigley ratified and joined the agreements governing drilling and operation of the well prior to the drilling of the well and whether the trial court correctly determined the cost of drilling and completing the well for purposes of allocating the expenses to Pease and Quigley's interest. We affirm the trial court's determination of costs and reverse and remand its ruling on the issue of ratification and joinder of the agreements.

On July 12, 1971, the State of Utah leased to the Anschutz Corporation all oil and gas rights in mineral lease No. 27653, Grand County, Utah (the "Lease"). In May 1976, by a "Unit Agreement" and a "Unit Operating Agreement," Anschutz formed the Willow Creek East Unit Area (the "Unit") and committed its interest in the Lease to the Unit.[1] At the time Anschutz committed the Lease to the Unit, Anschutz owned 100% of the working interest in the Lease. Anschutz became the original unit operator under the Unit Operating Agreement.

Under the terms of the Unit Agreement, Anschutz was required to drill an initial test well. To this end, Anschutz entered into a Farmout and Acreage Contribution Option (the "Farmout Agreement") with Pease and Quigley whereby Pease and Quigley agreed to drill the initial test well in exchange for an interest in the Unit. Pease and Quigley completed that well on June 6, 1976. There-

after, Anschutz assigned to Pease and Quigley 75% of its working interest in the Lease to a depth of 4,493 feet (the "Assignment"). The well was subsequently shut-in until it was abandoned on April 18, 1977.

Anschutz resigned as unit operator on September 4, 1979, and named Narmco, Inc., as the successor unit operator. In 1981, Narmco formed a drilling block[2] for the purpose of drilling well #29–13 (the "Well"). The interest owned by Pease and Quigley was included within the area of the drilling block.

Tenneco Oil Company, a successor unit operator, commenced drilling the Well on June 17, 1981. The Well was an exploratory well under the definitions of the Unit Operating Agreement and was drilled to a total depth of 4,797 feet, below the formations in which Pease and Quigley owned their interest. Tenneco failed to establish production at that depth, however, and came back uphole to the formations in which Pease and Quigley owned an interest. Tenneco successfully completed the Well in a formation in which Pease and Quigley owned an interest, but the Well was later shut-in.

In 1990, defendant Pioneer purchased the interest in the Well once owned by Tenneco. Pioneer contacted Pease and Quigley in October 1990 to inquire about buying their interest. Quigley responded favorably but later declined the offer. Pease did not respond until after the Well had been put into production. In November 1990, Pioneer built a pipeline to the Well and prepared it for production. Production from the Well commenced on November 24, 1990.

Pease and Quigley subsequently contacted Pioneer, offering to pay their proportionate share of the chargeable costs of the Well and seeking their proportionate share of proceeds from production. Pioneer identified the cost of the Well, but indicated that it considered Pease and Quigley's interest subject to the 300% nonconsent penalty imposed by the

---

1. The Unit Agreement joins the properties that participate in the Unit. The Unit Operating Agreement governs the relationships of the interest owners and operation of the Unit.

2. A drilling block is a subarea within the Unit. Pursuant to the Unit Operating Agreement, all owners of committed working interests within a drilling block were entitled to notice of the proposed well and an opportunity to elect to participate in the cost of drilling the proposed well.

Unit Operating Agreement upon nondrilling parties in the Unit.[3] On October 24, 1991, Pease and Quigley executed a Ratification and Joinder of Unit Agreement and Unit Operating Agreement (the "Ratification") reconfirming their joinder in the Unit.

Pease and Quigley then filed this action, seeking their proportionate share of proceeds from production of the Well and an accounting of the costs of drilling and completing the Well that they would be required to pay to Pioneer. Both parties moved for partial summary judgment to resolve the issue of whether Pease and Quigley's execution of the Farmout Agreement, whether by itself or in conjunction with the Assignment, constituted a ratification and joinder of the Unit as required by the Unit agreements for a transferred working interest to become committed to the Unit. The court ruled that neither the Farmout Agreement nor the Assignment, either separately or together, satisfied the ratification and joinder requirements and that Pease and Quigley did not become owners of a committed working interest until delivery to Pioneer of the Ratification. In addition, the court ruled that Pease and Quigley were nondrilling parties subject to the 300% nonconsent penalty of the Unit Operating Agreement.

After entry of partial summary judgment, the sole issue remaining for trial was a determination of the cost of drilling, completing, and operating the Well for the purpose of calculating the costs chargeable to Pease and Quigley's interest. At trial, the parties stipulated that Pease and Quigley owned an 18.75% working interest and a 15.646875% net revenue interest in the Well and that Pease and Quigley would be deemed nondrilling parties under the Unit Operating Agreement for purposes of trial. Pioneer produced testimony and evidence showing that the cost of drilling and completing the Well in 1981 was $801,575. Pioneer's evidence included (1) the original Tenneco estimate for the Well, known as the "Authority for Expenditure" ("AFE") and two versions of a supplement to the AFE after the Well was completed; (2) the last supplemental AFE signed in 1984, listing a cost of $801,575; (3) Tenneco's daily drilling report, which contained a running total of expenditures in the amount of $560,576 but which clearly did not detail all costs because it described testing performed after the drilling was completed for which no costs were provided; (4) an affidavit and testimony of a former Tenneco employee who reviewed the Well's total cost and stated that it was $801,575; (5) expert testimony that the Well was a wildcat well and that the costs of wildcat wells are greater because the owners usually seek more information while drilling; and (6) a publication from the American Petroleum Institute showing the average cost for wells drilled in Utah in 1981 to the same relative depth as the Well.

Pease and Quigley challenged Pioneer's failure to produce detailed documentation supporting its cost evidence, asserting that Pioneer had the burden of making an accounting of the costs and was required to establish and justify each expense claimed. In addition, Pease and Quigley produced testimony and evidence of wells they had drilled in the area of the Well which ranged in cost from $160,000 to just a little over $300,000.

The trial court ruled that Pioneer's predecessors in interest had reasonably disposed of the detailed cost documents before selling to Pioneer. The court found that the still-existing records contained sufficiently detailed and consistent evidence to establish the cost of drilling the Well; that the Well was a wildcat well; that costs of wildcat wells are greater than costs of developmental wells, the type Pease and Quigley drilled; that the cost of the Well, while on the high side, was within the range a company would reasonably expect to pay in 1981 for a similar well; and that $801,575 was reasonably incurred by Tenneco in drilling the Well.

On appeal, Pease and Quigley assert that the Farmout Agreement met the ratification and joinder requirements of the Unit agree-

---

3. This penalty is similar to the statutory nonconsent penalty imposed on nonconsenting owners in an order pooling interests for a drilling unit. *See* Utah Code Ann. § 40–6–6.5(4)(d) (penalty "to be determined by the board but not less than 150% nor greater than 300% of the nonconsenting owner's share").

ments and thus the 300% nonconsent penalty imposed upon nondrilling parties should not be applied to their interest. In the alternative, they argue that if the Farmout Agreement did not operate as a ratification and joinder of the Unit as a matter of law, it was ambiguous and therefore the trial court should have considered extrinsic evidence concerning the intent of the parties and should not have granted partial summary judgment to Pioneer. Finally, Pease and Quigley contend that the trial court erred in determining the cost of drilling and completing the Well for purposes of allocating the expenses chargeable to Pease and Quigley's interest.

■ We first address Pease and Quigley's contention that the Farmout Agreement met the requirements for ratification and joinder of the Unit and therefore the trial court erred in granting partial summary judgment in favor of Pioneer. Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Copper State Leasing v. Blacker Appliance,* 770 P.2d 88, 89 (Utah 1988). In reviewing the trial court's ruling, we accept the facts and inferences in the light most favorable to the nonmoving party. *Winegar v. Froerer Corp.,* 813 P.2d 104, 107 (Utah 1991). We review the trial court's grant of summary judgment for correctness, giving no particular deference to its conclusions of law. *Plateau Mining Co. v. Utah Div. of State Lands & Forestry,* 802 P.2d 720, 725 (Utah 1990).

■ Whether the Farmout Agreement constituted a ratification and joinder of the Unit depends upon the interpretation given to the language in the agreements. It is a basic rule of contract interpretation that the intent of the parties is to be determined from the writing itself, with each provision being considered in relation to all others. *Plateau,* 802 P.2d at 725; *Utah Valley Bank v. Tanner,* 636 P.2d 1060, 1061–62 (Utah 1981). When the meaning of a contract is clear and unambiguous, extrinsic evidence is generally not admissible to explain the intent of the parties and a court may interpret the contract as a matter of law. *Plateau,* 802 P.2d

at 725; *Faulkner v. Farnsworth,* 665 P.2d 1292, 1293 (Utah 1983). But when a contract provision is ambiguous because it is susceptible to more than one reasonable interpretation due to uncertain meaning of terms, missing terms, or other facial deficiencies, extrinsic evidence is admissible to explain the intent of the parties. *Winegar,* 813 P.2d at 108; *Faulkner,* 665 P.2d at 1293. If a contract is ambiguous and the case was decided on summary judgment, that decision will be upheld only if the undisputed extrinsic evidence regarding the intent of the parties shows that the successful position is correct as a matter of law. Utah R.Civ.P. 56(c); *see Brown v. Weis,* 871 P.2d 552, 559 (Utah Ct.App.1994); *Fashion Place Inv. v. Salt Lake County,* 776 P.2d 941, 943 (Utah Ct. App.), *cert. denied,* 783 P.2d 53 (Utah 1989). Thus, in assessing whether a genuine issue of material fact exists in this case, we must first determine whether the terms of the agreement between the parties are clear and unambiguous. Whether an ambiguity exists is itself a question of law, and we accord no deference to the trial court's conclusion. *Winegar,* 813 P.2d at 108; *Faulkner,* 665 P.2d at 1293.

Ratification and joinder of the Unit is governed by the Unit Agreement and the Unit Operating Agreement. Article 19 of the Unit Agreement provides:

[A]ny grant, transfer, or conveyance of interest in land or leases subject hereto shall be and hereby is conditioned upon the assumption of all privileges and obligations hereunder by the grantee, transferee, or other successor in interest. No assignment or transfer of any working interest, royalty, or other interest subject hereto shall be binding upon Unit Operator until the first day of the calendar month after Unit Operator is furnished with the original, photostatic, or certified copy of the instrument or transfer.

Article 26.3 of the Unit Operating Agreement further provides:

No transfer of any Committed Working Interests shall be effective unless the same is made expressly subject to the Unit Agreement and this agreement and the transferee agrees in writing to assume and

perform all obligations of the transferor under the Unit Agreement and this agreement insofar as it relates to the interest assigned. . . .

The clear import of these provisions is to require the transferee to assume in writing all the obligations of the transferor and to set up a procedure whereby the unit operator is notified that a transfer of interests has occurred within the Unit and that the transferee has agreed to be bound by the terms of the Unit agreements. Under these provisions, a unit operator will not recognize the transfer of a working interest until these requirements are met. However, the required writing may be in any form.

Pease and Quigley assert that by signing the Farmout Agreement, they assumed "all privileges and obligations" of the Unit and agreed "in writing to assume and perform all obligations of the transferor." They base their argument on paragraph X of the Farmout Agreement, which provides in part, "By your acceptance of this Agreement, you agree to adopt, ratify and confirm the plan of unitization and Operating Agreement for [the Unit], currently awaiting the final approval of the United States Geological Survey." It is clear from this provision, they argue, that when they accepted and agreed to the Farmout Agreement they thereby adopted, ratified, and confirmed the Unit agreements. In addition, they assert that because Anschutz was the unit operator at the time it executed the Farmout Agreement and the Assignment, it clearly had notice and a copy of the transfer. Thus, they claim, the transfer of their interest satisfied the requirements of the Unit agreements for them to be recognized as owners of committed working interests in the Unit.

■ Pease and Quigley also contend that even if paragraph X is executory, that provision should be construed as a ratification of the Unit agreements because it obligated them to ratify the Unit agreements and they could have been ordered by a court to do so. In support, they rely on *Nixon & Nixon, Inc. v. John New & Associates,* 641 P.2d 144, 146 (Utah 1982), for the proposition that under Utah law, when a party has promised to do a specific ascertainable thing and the only re-

maining question is the time in which the thing is to be done, that promise may be specifically enforced. Similarly, they rely on *Travelers Insurance Co. v. Lewis,* 531 P.2d 484, 485 (Utah 1975), for the principle that "equity regards as done that which ought to be done" and thus courts treat as having been performed those things which the actor is obligated to perform.

This argument is unpersuasive for two reasons. First, even if the Farmout Agreement obligated Pease and Quigley to ratify the Unit agreements, the issue still remains whether Pease and Quigley's execution of the Farmout Agreement constituted a ratification and joinder of the Unit as required by the Unit agreements. An obligation to join the Unit and actually doing what is necessary to join the Unit is not a mere formal distinction insofar as the unit operator is concerned. The unit operator must provide notice of drilling only to those who have actually joined the Unit. Thus, whether the parties intended that the Farmout Agreement would be the document that gave notice to the unit operator that Pease and Quigley had joined the Unit and were willing to share in the costs of Unit operations is critical in determining the respective obligations of the parties before drilling began.

Second, the rule stated in *Travelers* does not resolve whether Pease and Quigley's execution of the Farmout Agreement ratified the Unit. In *Travelers,* the court was required to determine the proper beneficiaries to an insurance policy on the life of the decedent. The decedent had changed the named beneficiary, contrary to a court order, and the insurance company sought equitable relief to determine the rights of the interested parties. The court stated, "A court of equity can and should regard as done that which ought to be done; and, similarly, it can and should regard as not having been done that which ought not to have been done." *Travelers,* 531 P.2d at 485. Accordingly, it disregarded the forbidden attempted change of beneficiaries. *Id.*

■ Application of the principle that "equity regards as done that which ought to be done" does not apply to every executory

contract or every person or situation. *Bair v. Willis,* 218 Ga. 563, 129 S.E.2d 774, 777 (1963); *West–Nesbitt, Inc. v. Ralston Purina Co.,* 128 Vt. 498, 266 A.2d 469, 474 (1970); 30A C.J.S. *Equity* § 121 (1992); Am.Jur.2d *Equity* § 126 (1966). It only operates in favor of a party " 'who holds the equitable right to have the act performed, as against the one upon whom the duty of such performance has devolved.' " *West–Nesbitt,* 266 A.2d at 474 (quoting 2 Pomeroy's *Equity Jurisprudence,* § 365); *Bair,* 129 S.E.2d at 777; 30A C.J.S. *Equity* § 121 (1992). *Travelers* involved just such a situation.[4] This case does not. With respect to ratification and joinder of the Unit agreements, Pease and Quigley are not seeking equity to consider performed an act that someone else, i.e., Pioneer, was obligated, but refused or failed to perform. Rather, they turn that proposition upside down and argue that equity should consider performed a condition they had the option of performing. Their equitable argument has no merit. *See Battistone v. American Land & Dev. Co.,* 607 P.2d 837, 839 (Utah 1980) ("A court in equity will generally not assist one in extricating himself from circumstances which he has created.").

Pioneer argues that the Farmout Agreement did not operate to ratify the Unit agreements, but rather, contemplated that Pease and Quigley would execute a separate ratification and joinder of the Unit at some later date. Pioneer contends that the Farmout Agreement language "you agree to adopt, ratify and confirm" plainly contemplates some future act and that if the parties had intended the ratification and joinder to be contemporaneous with the signing of the Farmout Agreement, they would have clearly so provided. In addition, Pioneer asserts that a review of other language in the Farm-

out Agreement indicates that the agreement was executory in nature and placed a duty on Pease and Quigley to take appropriate future action. In support, Pioneer compares paragraph X with the other provisions in the Farmout Agreement that use the phrase "you agree to" that clearly require future acts. Finally, Pioneer emphasizes that the Farmout Agreement did not transfer any ascertainable interest to Pease and Quigley. In support, they cite the long-settled law that this type of farmout agreement is executory and creates no ascertainable interest until it is fully performed. *Petroleum Financial Corp. v. Cockburn,* 241 F.2d 312, 313 (5th Cir.1957); *Chevron U.S.A., Inc. v. Aguillard,* 496 F.Supp. 1031 (M.D.La.1980); Howard R. Williams & Charles J. Meyers, *Oil & Gas Law* § 432 (1986); 3 W. L. Summers, *The Law of Oil & Gas* § 544 (1958). Thus, Pioneer contends, it could not have constituted a ratification and joinder of the Unit because Pease and Quigley did not hold an interest in the Unit when they signed it and could not have joined the Unit at that time.

■ A contract provision is not necessarily ambiguous because the parties differ in their interpretation of its language. *Plateau,* 802 P.2d at 725. To demonstrate ambiguity, the contrary positions must each be a reasonable interpretation of the terms in the provision. *Id.* After carefully reviewing the language of the agreements, we cannot say that either party's interpretation of the language in paragraph X of the Farmout Agreement is unreasonable. The Unit Operating Agreement does not expressly require the transferee's assumption of obligations to be a separate writing or to be in any specific form.[5] Thus, the language "you agree to adopt, ratify and confirm the plan of unitization" could

---

4. Likewise, in *Stauth v. Brown,* 241 Kan. 1, 734 P.2d 1063, 1070 (1987), cited by Justice Howe in his dissent, the unperformed obligations of both parties to a real estate contract were at issue. The court stated that because no adequate remedy existed at law, a court in equity may compel a party to a contract to do that which ought to be done and accordingly ordered the performance of both parties.

5. We recognize the potential for abuse of unitization arrangements on the part of an interest owner who does not elect to share the risks of

drilling expensive exploratory wells but later seeks to participate in the proceeds of a productive well. To prevent abuse, it is critical that the parties implement a system whereby the unit operator knows with certainty who owns interests in a unit and which owners have elected to participate in the expense of drilling and completing a well. This may require unit agreements to designate a particular form or specific language to signify the assumption of obligations on the part of a transferee and foreclose any ambiguity.

reasonably be interpreted to satisfy the Unit Operating Agreement requirement that a transferee assume in writing all obligations of the transferor, since Pease and Quigley were bound thereby to assume all obligations of the Unit agreements.

Conversely, that language could also reasonably be interpreted to require Pease and Quigley to ratify and join the Unit by executing a separate document after receiving the Assignment, especially when considered in light of a number of other provisions in the Farmout Agreement wherein the language "agree to" clearly contemplated future acts. Without resort to extrinsic evidence, it is unclear whether the parties intended the signing of the Farmout Agreement to operate as the required ratification and joinder of the Unit or whether they anticipated some future act on the part of Pease and Quigley.

We hold that the language in paragraph X of the Farmout Agreement is ambiguous and that this ambiguity cannot be resolved from an objective and reasonable interpretation of the agreements as a whole. Although both parties cite extrinsic evidence to bolster their interpretation of the language in the Farmout Agreement,[6] that evidence is very much in conflict.

Pioneer refers to documents designating successor unit operators and to documents admitting new lands to the Unit, all of which were signed by the owners of committed working interests but did not list Pease and Quigley as interest owners or require their consent. Pioneer also points to the absence of records in the Bureau of Land Management's file for the Unit showing Pease and Quigley as owners of a committed working interest and asserts that even Anschutz, the transferee of Pease and Quigley's interest, did not list Pease and Quigley as owners of a committed working interest in any Unit documents.

Pease and Quigley refer to an affidavit by the executive vice president of Anschutz stating that it was the company's intent that by executing the Farmout Agreement, Pease and Quigley contemporaneously agreed in writing to assume the obligations of the Unit agreements. Pease and Quigley also point to notices of proposed activities in the Unit that they received in 1988 and 1989 from Pioneer's predecessor unit operators and assert that these notices show they were treated as if they were parties to the Unit agreements.

The extrinsic evidence relied on by the parties reinforces the conclusion that a genuine issue of fact material to the intent of the parties exists, making summary judgment on that issue improper. Therefore, we reverse the partial summary judgment and remand for trial on the issue of whether the Farmout Agreement operated as a ratification and joinder of the Unit so as to make Pease and Quigley owners of a committed working interest in the Unit prior to the drilling of the Well.

 Pease and Quigley also challenge the sufficiency of the evidence upon which the trial court based its findings of fact regarding the cost of drilling and completing the Well. To mount a successful attack upon the correctness of a trial court's findings of fact, an appellant must first marshal all the evidence in support of the finding and then demonstrate that the evidence is legally insufficient to support the finding even when viewing it in a light most favorable to the court below. *Doelle v. Bradley*, 784 P.2d 1176, 1178 (Utah 1989); *Grayson Roper Ltd. v. Finlinson*, 782 P.2d 467, 470 (Utah 1989); *Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896, 899 (Utah 1989). We will conclude that a trial court's finding is lacking adequate evidentiary support only if it is against the clear weight of evidence and thus "clearly erroneous." *In re Estate of Bartell*, 776 P.2d 885, 886 (Utah 1989); Utah R.Civ.P. 52(a); *see Doelle*, 784 P.2d at 1178; *Grayson*, 782 P.2d at 470; *Reid*, 776 P.2d at 899–900.

In marshalling the evidence in this case, Pease and Quigley have not attempted to show that the trial court's findings of fact regarding the cost of drilling and completing the Well were so lacking in evidentiary support as to be against the clear weight of the

---

**6.** The factual nature of the issue regarding the interpretation of the language in the Farmout Agreement is further highlighted by the trial court's reference to extrinsic evidence in support of its ruling on Pease and Quigley's motion to set aside the partial summary judgment.

evidence. Rather, they have argued that while the trial court's findings were supported by evidence, it was legally improper evidence and should not have been considered because the Unit Operating Agreement requires a different type of evidence. They base their claim on the procedure set forth in the Accounting Procedure Joint Operations document (known as the "COPAS"), attached to the Unit Operating Agreement, whereby a nonoperator may request an accounting of the costs incurred by the unit operator. The COPAS provides in relevant part:

2. Operator shall bill Non–Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense. . . .

. . . .

4. Payment of any such bill shall not prejudice the right of any Non–Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non–Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non–Operator takes written exception thereto and makes claim on Operator for adjustment. . . .

5. A Non–Operator, upon written notice to Operator and all other Non–Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for taking of written exception to and the adjustments of accounts as provided for in Paragraph 4. . . .

Pease and Quigley argue that because Pioneer did not produce the bills, statements, and other appropriate documentation required by the COPAS, Pioneer produced insufficient evidence to establish the actual costs of the Well and either cannot recover costs at all or under a theory of *quantum meruit* may recover from Pease and Quigley only on the basis of what it reasonably should have cost to drill this type of well. Their argument is without merit.

Under the provisions of the COPAS quoted above, if no challenge is made to the expenses incurred by a unit operator within twenty-four months following the calendar year in which they are incurred, the expenses are conclusively "presumed to be true and correct." In addition, a nonoperator may not request an audit of the unit operator's cost information past the audit period. It follows, therefore, that a unit operator would reasonably be required to retain supporting documentation for a maximum period of three years.

At trial, Pioneer produced an expert who testified that it would be reasonable for a unit operator to discard the supporting documentation after the audit period because even nonoperators could not ask for detailed cost information past that time. In addition, Pioneer's expert testified that it was understood in the industry that when a request for an audit came after the audit period, the requester would have to accept as true and correct the numbers the unit operator had available. This testimony is consistent with the provisions in the COPAS, and Pease and Quigley have not pointed to any evidence which refutes it.

Pease and Quigley assert that the accounting period is premised upon the nonoperator's receiving a bill from the unit operator. They argue that because they neither received a bill nor were aware of their interest in the Well, Pioneer must produce the accounting required by the COPAS even though the accounting period has passed. Their interpretation is contrary to the express terms of the COPAS. The COPAS provides that nonoperators may audit the unit operator's accounts for a maximum period of three years, regardless of who had or had not requested an accounting. Even if Pease and Quigley's failure to request an

accounting during the audit period was due to their lack of knowledge of their interest in the Well, it would still have been reasonable for the unit operator to dispose of detailed cost information after the audit period. In addition, the evidence presented at trial supports the trial court's conclusion that it was reasonable for Pioneer's predecessors in interest to dispose of the detailed cost documents regarding the expenses incurred in drilling and completing the Well.

■ In the absence of detailed cost documentation, it was reasonable for the trial court to entertain other evidence from the parties to determine the costs associated with drilling and completing the Well. The trial court found that the still-existing records contained sufficient detailed evidence and were sufficiently consistent to establish that the cost of drilling and completing the Well was $801,575, that the Well was a wildcat well, which usually involves greater costs, and that the cost, while on the high side, was within the range a company would expect to pay in 1981 for a similar well. The only evidence Pease and Quigley identify to refute these findings is their own testimony and evidence that they had drilled wells near the Well at about the same time period for substantially less. Having considered this evidence, we are unpersuaded that the trial court's findings of fact were clearly erroneous.

Affirmed in part and reversed and remanded in part.

DURHAM and RUSSON, JJ., concur.

ZIMMERMAN, Chief Justice, concurring and dissenting:

I would affirm the trial court's ruling in its entirety. I find the language of paragraph X of the Farmout Agreement to be sufficiently unambiguous to warrant granting judgment for Pioneer. It may be true that the extrinsic evidence points to a conflict in interpretations, at least when the affidavit of the Anschutz official is considered. However, extrinsic evidence is not to be resorted to until we have first found ambiguity. *Plateau Mining Co. v. Utah Div. of State Lands &*

*Forestry,* 802 P.2d 720, 725 (Utah 1990). I find none.

The words "agree to adopt, ratify and confirm" in paragraph X seem plainly to contemplate a separate writing, which was never executed. If the agreement meant what plaintiffs contend it means, it would have said, "[W]e hereby adopt, ratify and confirm...." It does not say that, and I cannot see how it can even arguably be read to say that.

For the foregoing reasons, I would affirm the court below.

HOWE, Justice, dissenting:

I dissent. When Pease and Quigley signed the Farmout Agreement, they fully agreed "in writing to assume and perform all obligations of the transferor" as required by the Unit agreements.

Paragraph X of the Farmout Agreement provides in part:

> *By your acceptance of this Agreement,* you agree to adopt, ratify and confirm the plan of unitization and Operating Agreement for [the Unit]....

(Emphasis added.) This sentence is not ambiguous. When Pease and Quigley signed the Farmout Agreement—doing so directly under the words "ACCEPTED and AGREED"—they thereby simultaneously adopted, ratified, and confirmed the Unit agreements. In other words, their signing of the Farmout Agreement was the means by which they adopted, ratified, and confirmed the Unit agreements.

Unlike numerous other provisions of the Farmout Agreement that set forth "you agree to" executory promises on the part of Pease and Quigley, paragraph X is the only provision which begins with the phrase "By your acceptance of this Agreement." The reason is clear: The other "you agree to" provisions are all acts that could not be accomplished by the signing of the document, e.g., the drilling of a test well. However, Pease and Quigley were not precluded from ratifying the Unit agreements in the Farmout Agreement. "By [their] acceptance" of the Farmout Agreement, Pease and Quigley fully complied with the requirement of the

transfer provisions that they assume and agree to be bound by the Unit agreements.

Even if this court interprets paragraph X to be an executory agreement, as a matter of law, it should still act as the equivalent of a ratification. Paragraph X leaves no question that Pease and Quigley were under legal obligation to "adopt, ratify and confirm" the Unit agreements, and could have been ordered by a court to do so. *See Nixon & Nixon, Inc. v. John New & Assocs., Inc.*, 641 P.2d 144, 146 (Utah 1982). Equity treats things agreed to be done as having been actually performed. *See Travelers Ins. Co. v. Lewis*, 531 P.2d 484, 485 (Utah 1975); *Stauth v. Brown*, 241 Kan. 1, 734 P.2d 1063, 1070 (1987); 30A C.J.S. *Equity* § 121 (1992); 27 Am.Jur.2d *Equity* § 126 (1966). Thus we should treat Pease and Quigley's agreement to "adopt, ratify and confirm" the Unit agreements as the actual adoption, ratification, and confirmation of those agreements.

The majority rejects this argument, stating:

> [E]ven if the Farmout Agreement obligated Pease and Quigley to ratify the Unit agreements, the issue still remains whether Pease and Quigley's execution of the Farmout Agreement constituted a ratification and joinder of the Unit as required by the Unit agreements.

The majority misses the point. The law considers the promise in paragraph X to adopt, ratify, and confirm as having been fully performed. Thus "whether Pease and Quigley's execution of the Farmout Agreement constituted a ratification and joinder" does not "remain" the issue.

The majority asserts that equity should not act "in favor of" Pease and Quigley because "they had the option of performing" and failed to do so. To the contrary, Pease and Quigley had no "option" to ratify the Unit agreements but were legally obligated to do so. Equity should treat that absolute obligation as actual ratification.

The trial court should have held that the Farmout Agreement satisfied the ratification provisions of the Unit agreements. I would reverse the trial court judgment on this issue.