INTERWEST CONSTRUCTION, a
Utah corporation, Plaintiff
and Respondent,

v.

R. Roy PALMER and Val W. Palmer,
dba A.H. Palmer & Sons, Defendants
and Respondents.

R. Roy PALMER and Val W. Palmer,
dba A.H. Palmer & Sons, Third–Party
Plaintiffs and Respondents,

v.

John RYSGAARD, dba Fiberglass Structures Company and Fiberglass Structures Company, Inc., Third–Party Defendants and Respondents.

FIBERGLASS STRUCTURES AND TANK COMPANY, fka Fiberglass Structures Company of St. Paul, Inc., Third–Party Plaintiffs and Respondents,

v.

THIOKOL CORPORATION, Third–Party
Defendant and Petitioner.

No. 940616.

Supreme Court of Utah.

June 14, 1996.

Rehearing Denied Sept. 24, 1996.

Steven D. Crawley, Robert C. Keller, Salt Lake City, for Interwest Construction.

George W. Preston, Logan, and Robert T. Wallace, Salt Lake City, for A.H. Palmer & Sons.

John E. Daubney, St. Paul, Minn., for Rysgaard and Fiberglass Structures.

Anthony B. Quinn, Mary Anne Q. Wood, Richard G. Wilkins, Salt Lake City, for Thiokol.

Mark F. James, Salt Lake City, for amicus Utah Manufacturers Association.

ZIMMERMAN, Chief Justice:

Following the trial court's entry of judgment on a contract dispute in favor of Interwest Construction ("Interwest") and A.H. Palmer and Sons ("Palmer"), Thiokol Corporation ("Thiokol") appealed to this court, and we poured the appeal to the court of appeals. We then granted certiorari to review the court of appeals' decision affirming the trial court judgment. *See Interwest Constr. v. Palmer*, 886 P.2d 92 (Ct.App.1994), *cert. granted sub nom. Fiberglass v. Thiokol*, 892 P.2d 13 (Utah 1995). Our present review is limited to considering whether the court of appeals erred in holding (i) that our decision in *Beck v. Farmers Insurance Exchange*, 701 P.2d 795 (Utah 1985), precludes tort actions for negligence and strict liability arising out of the breach of contractually defined obligations; and (ii) that Thiokol waived its rights to enforce its contract with Interwest.

Thiokol does not appeal the trial court's findings of fact. The trial court initially detailed its findings by memorandum decision and then by formal findings of fact and conclusions of law. Accordingly, we recite the facts in a light most favorable to the trial court's findings. *State v. A House & 1.37 Acres*, 886 P.2d 534, 535 (Utah 1994).[1]

In the fall of 1988, Thiokol and Interwest entered into a contract under which Interwest agreed to build a wastewater treatment facility for Thiokol. Interwest subsequently subcontracted with Palmer for labor and materials in connection with the construction of the facility. Palmer, in turn, subcontracted with Fiberglass Structures and Tank Company, Inc. ("Fiberglass Structures"), for the purchase of three fiberglass wastewater stor-

---

1. These facts are largely drawn from the Utah Court of Appeals' opinion in this case. For a more complete recitation of the facts, see *Interwest Construction v. Palmer*, 886 P.2d 92, 94–95 (Ct.App.1994), *cert. granted sub nom. Fiberglass v. Thiokol*, 892 P.2d 13 (Utah 1995).

age tanks for the facility. Palmer's purchase order required Fiberglass Structures to follow Thiokol's plans and specifications unless it obtained prior approval to deviate from them.

Thiokol's plans and specifications for the treatment facility designated the fiberglass tanks as T32, T33, and T34 and called for the tanks to be built in accordance with "applicable requirements" of NBS/PS 15–69, a national voluntary industry standard governing the construction of fiberglass tanks. The tanks were designed to collect wastewater from four smaller tanks located inside the treatment building by means of a gravity-feed system. Because the tanks inside the building were smaller than the three external tanks, the gravity-feed system allowed the external tanks to become only two-thirds full at maximum. Thiokol approved specifications for the tanks indicating that their walls would be 1/4 inch thick.

Fiberglass Structures shipped prefabricated fiberglass panels to the treatment facility site. The panels were bolted together along vertical seams to create each of the three tanks, and the tanks were bolted to a concrete base outside the treatment building. The top of each tank was bolted to the sides, and fill pipes were connected between the three external and the four internal tanks. The three external tanks were completed and installed on April 30, 1989. During a trial test that same day, tank T34 burst along one of the vertical seams connecting two of its fiberglass panels. Nevertheless, on May 2, 1989, Thiokol inspected the treatment facility and notified Interwest that the facility was substantially complete with the exception of a few punch-list items, which did not include the ruptured tank or necessary repairs to the other two tanks. The same day, Palmer gave Thiokol a one-year warranty on all then-installed work.

Thiokol hired an independent consulting engineer to review the cause of tank T34's failure, and the consultant recommended that Thiokol discard all three tanks. The consultant was concerned about the strength of the tanks' vertical panels, among other things, and recommended increasing the thickness of the panels from 1/4 inch, as per the original design, to 3/4 inch. However, Thiokol's project engineer directed the consultant to focus on fixing the tanks' seams. Thereafter, Thiokol negotiated separately and directly with Fiberglass Structures for the repair of tanks T32 and T33 and replacement of tank T34; Thiokol's involvement was such that the trial court concluded that Thiokol and Fiberglass Structures "jointly constructed the tanks." Specifications for the modified tanks clearly indicated that they would have 1/4–inch–thick walls and a safety factor of 6.

In early June of 1989, Thiokol tested and accepted the repaired tanks on the basis of its determination that the tanks met its specifications. On June 13th, Fiberglass Structures gave Thiokol an extended three-year warranty at Thiokol's insistence, which warranted the structural integrity of the tanks but expressly excluded damage resulting from modifications to the tanks. Interwest and Palmer were minimally, if at all, involved in these negotiations.

In June of 1989, Thiokol began operating the treatment facility. Sometime that month, without the knowledge of Interwest, Palmer, or Fiberglass Structures, Thiokol changed the tanks' filling system from the original gravity-feed design to an overhead, high-pressure pump feed.

On August 24, 1989, tank T33 ruptured, spilling its wastewater contents. The trial court found that the pump feed system allowed the tank to be overfilled and that tank T33 failed because it was overfilled by a Thiokol employee. Given the pumping capacity, there was an insufficient opening at the top of the tank to allow for the escape of excess wastewater, thus causing an uplift pressure which the tank was not designed to withstand. The overfilling and consequent uplift pressure caused the tank to lift up from its concrete base and to split from the bottom up along the middle of one of the fiberglass panels, not along a seam as was the case with tank T34's earlier failure.

At the time of the second failure, Thiokol withheld $200,000 which it owed to Interwest on the original contract. That amount included $93,653.70 which Interwest owed to Palmer. The instant action began when Interwest sued Palmer for breach of warranty, negligence, indemnity, and breach of contract. Palmer then filed a third-party complaint against Fiberglass Structures, which in turn filed a third-party complaint against Thiokol. Interwest later added Thiokol as a defendant and sought recovery for breach of contract and unjust enrichment. Thiokol eventually counterclaimed against Interwest, Palmer, and Fiberglass Structures for breach of contract, breach of express and implied warranties, negligence, and strict liability.

After a two-week bench trial, the trial court concluded in relevant part that (i) it would not address Thiokol's tort claims because the case was "entirely controlled by contract"; (ii) the NBS/PS 15–69 standard was not incorporated into the contract so as to specify a particular wall thickness or safety factor for the fiberglass panels and, therefore, Thiokol could not hold its suppliers liable for failing to provide tanks with a specific wall thickness and safety factor; (iii) neither Interwest, Palmer, nor Fiberglass Structures failed to comply with the contract in any way which caused or resulted in the August 24th failure of tank T33; (iv) Thiokol failed to prove the cause of tank T33's failure and the most likely cause was Thiokol's overfilling the tank; and (v) Thiokol's overfilling the tanks barred its recovery under any of its suppliers' warranties. Accordingly, the trial court ordered Thiokol to pay Interwest $200,000, ordered Interwest to pay Palmer $93,653.70, and dismissed all other claims. The court of appeals affirmed, and Thiokol's petition to this court followed.

On certiorari to this court, Thiokol contends that the court of appeals erred in affirming the dismissal of Thiokol's tort claims. In addition, Thiokol claims the court of appeals erred in holding that Thiokol waived its right to assert that the modified tanks should have complied with the NBS/PS 15–69 standard. Thiokol claims that each of these issues presents only questions of law which this court should review non-deferentially. *See State v. Pena*, 869 P.2d 932, 935–36 (Utah 1994).

■ We first address the dismissal of Thiokol's tort claims. In its post-trial memorandum decision, the trial court refused to address Thiokol's negligence and strict liability claims because it concluded that the case was "entirely controlled by contract." The court of appeals affirmed, reasoning that because "the contract expressly provided that [Interwest and Palmer] were under a duty to design, construct, and deliver a product free from defects and suitable for the purposes for which it was to be used," their "responsibility in tort is ... exactly co-extensive with their contractual obligations," thus precluding Thiokol's tort claims. *Interwest Constr.*, 886 P.2d at 101. Thiokol maintains that the court of appeals misconstrued our earlier decision in *Beck* as establishing the proposition that "if parties arrange rights, duties, and obligations under a contract, any cause of action for breach of those contractually defined obligations, rights, or duties lies in contract, not in tort." *Id.* (citing *Beck*, 701 P.2d at 799–800).

Although we ultimately reach the result that Thiokol's tort claims fail, we agree with Thiokol that the court of appeals misapplied our holding in *Beck*. In *Beck*, we addressed whether an insurer's breach of the covenant of good faith and fair dealing allowed its insured to sue the insurer in tort. We held that "in a first-party relationship between an insurer and its insured, the duties and obligations of the parties are contractual rather than fiduciary." *Beck*, 701 P.2d at 800. Because we found no independent fiduciary duty in the first-party insurance relationship, but only a contractual duty to pay claims, we further held, "Without more, a breach of [contractual] implied or express duties can give rise only to a cause of action in contract, not one in tort." *Id.*

Nonetheless, we specifically noted in *Beck* that "in some cases the acts constituting a breach of contract may also result in breach-

es of duty that are independent of the contract and may give rise to causes of action in tort." *Id.* at 800 n. 3 (giving examples). However, in *Beck,* we refused, for a number of policy reasons, *see id.* at 798–801, to recognize a tort action in the context of a first-party insurance relationship.

In the instant case, the court of appeals assumed on the basis of *Beck* that language in Thiokol's contract calling for a product "free from defects" supplanted any independent tort duties the suppliers might have had to deliver nondefective products or services. *See Interwest Constr.,* 886 P.2d at 101. But the limitation we adopted in *Beck* is not broadly applicable to all contracts in all circumstances; rather, it referred to a specific relationship between contracting parties. Each category of relationships must be analyzed to determine, as a matter of law and policy, whether in that setting a party to a contract owes any tort-type duties to the other beyond the duties spelled out in the contract. *See, e.g., Beach v. University of Utah,* 726 P.2d 413, 417–20 (Utah 1986) (applying analytical model for determining whether tort duties exist); *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 92, at 655 (5th ed.1984) (recommending that courts consider (i) the nature of the defendant's activity, (ii) the relationship between the parties, and (iii) the type of injury or harm threatened to determine whether tort obligations are owed in addition to contract promises).

Thiokol cites *DCR Inc. v. Peak Alarm Co.,* 663 P.2d 433 (Utah 1983), as an example of an instance where we recognized that a tort duty may exist even when the relationship between the parties is founded upon a contract. In *DCR Inc.,* we allowed a clothing store owner to pursue a tort claim against a company which agreed to install and maintain a burglar alarm when the company knew but failed to warn the store owner that the alarm could be easily deactivated by criminals. *Id.* at 434. We recognized that under those factual circumstances, one who undertakes to provide services for another owes a tort duty to the other to perform such services with reasonable care. *Id.* at 435–37; *see* Restatement (Second) of Torts § 323 (1965).[2] We explained that " 'the defendant's tort liability is not based upon breach of contract, but rather upon violation of the legal duty independently imposed as a result of what the defendant undertook to do with relation to the plaintiff's interests.' " *Id.* at 437 (quoting Carl S. Hawkins, *Retaining Traditional Tort Liability in the Nonmedical Professions,* 1981 B.Y.U. L.Rev. 33, 36).

We agree that a buyer of products or services may, in some circumstances, assert tort claims along with breach of contract claims against a supplier. That recognition is nothing more than an acknowledgment that virtually all courts have permitted certain actions—for example, products liability—to include claims sounding in both tort and contract. *See* Keeton et al., *supra,* § 92, at 660–61.

We therefore disagree that the tort duties of Thiokol's suppliers are necessarily "exactly co-extensive with their contractual obligations," as the court of appeals held. *Interwest Constr.,* 886 P.2d at 101. Here, Thiokol alleged that its suppliers failed to use reasonable care to prevent foreseeable harm to others (negligence) or manufactured and sold the tanks in a defective condition that made them unreasonably dangerous to oth-

**2.** Section 323 of the Restatement provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> > (a) his failure to exercise such care increases the risk of harm, or

> > (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965). We also note that manufacturers and suppliers of products may be subject to other tort duties even though their products are sold via contract. *See id.* §§ 388–90 (pertaining to suppliers); *id.* §§ 395–98 (pertaining to manufacturers); *id.* § 402A (pertaining to strict liability for defective products).

ers (strict liability). Our decision in *Beck* does not control whether these tort claims can coexist with Thiokol's contract claims. That determination requires a deeper analysis. But for the purposes of this appeal, that analysis is unnecessary. We will take a shorter route and simply assume, without deciding, that some tort and contract claims can coexist in the instant case.

■ In light of this assumption, we also hold that the "free from defects" contractual provision cited by the court of appeals is insufficient as a matter of law to exempt Thiokol's suppliers from strict tort or negligence liability. On grounds of public policy, parties to a contract may not generally exempt a seller of a product from strict tort liability for physical harm to a user or consumer unless the exemption term "is fairly bargained for and is consistent with the policy underlying that [strict tort] liability." Restatement (Second) of Contracts § 195(3) (1981). While parties to a contract may generally exempt themselves from negligence liability, the language they use must " 'clearly and unequivocally' express an intent to limit tort liability" in the contract itself. *DCR Inc.*, 663 P.2d at 438; *see also* Restatement (Second) of Contracts § 195 cmt. b (1981). Without such an expression of intent, " '*the presumption is against any such intention, and it is not achieved by inference or implication from general language* such as was employed here.' " *DCR Inc.*, 663 P.2d at 437 (quoting *Union Pac. R.R. v. El Paso Natural Gas Co.*, 17 Utah 2d 255, 408 P.2d 910, 914 (1965)).

Accordingly, we hardly see how a contractual promise to provide a product "free from defects" amounts to an exemption from tort liability, especially when we have refused to enforce very detailed and thorough exculpatory clauses that presented a much closer case for exemption. *See Union Pac. R.R.*, 408 P.2d at 912–14. We therefore conclude that Thiokol's strict liability and negligence claims were not precluded by the existence of a contract which contained a promise that Interwest and its subcontractors would sup-

ply products "free from defects." We thus disapprove of the reasoning employed by the court of appeals to affirm the trial court's decision.

■ We now address Thiokol's negligence and strict liability claims on the merits. "To recover for negligence, a plaintiff must show that the defendant owed the plaintiff a duty, the defendant breached the duty, the breach was a proximate cause of the plaintiff's injuries, and there was in fact injury." *Jackson v. Righter*, 891 P.2d 1387, 1392 (Utah 1995); *see also Hunsaker v. State*, 870 P.2d 893, 897 (Utah 1993); *Reeves v. Gentile*, 813 P.2d 111, 116 (Utah 1991); *Williams v. Melby*, 699 P.2d 723, 726 (Utah 1985). To recover on a strict liability theory against a seller engaged in selling products of the kind at issue, a plaintiff must prove (i) that the product was unreasonably dangerous due to a defect or defective condition, (ii) that the defect existed at the time the product was sold, and (iii) that the defective condition caused the plaintiff's injuries. *Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 929 (Utah 1993); *see also Mulherin v. Ingersoll–Rand Co.*, 628 P.2d 1301, 1302 (Utah 1981); *Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 158 (Utah 1979); Restatement (Second) of Torts § 402A (1965); Keeton et al., *supra*, § 103.

■ Assuming, without deciding, that Thiokol's suppliers owed it tort duties which they breached, it is nonetheless axiomatic that to successfully prosecute actions for negligence and strict liability, the complaining party must prove that another party's breach of duty proximately caused the first party's injury. *See Jackson*, 891 P.2d at 1392 (negligence); *Mulherin*, 628 P.2d at 1304 (strict liability); *see also* Restatement (Second) of Torts § 281 (1965). Proof of proximate cause is also required in breach of warranty actions, which may sound in either contract or tort. *Mitchell v. Pearson Enters.*, 697 P.2d 240, 247 (Utah 1985); *Mulherin*, 628 P.2d at 1304; *Hahn*, 601 P.2d at 159. "Proximate cause is ' "that cause which, in natural and continuous sequence[ ] (unbroken by an

efficient intervening cause), produces the injury, and without which the result would not have occurred. It is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury." ' " *Harline v. Barker*, 912 P.2d 433, 439 (Utah 1996) (alteration in original) (quoting *Mitchell*, 697 P.2d at 245–46 (quoting *State v. Lawson*, 688 P.2d 479, 482 n. 3 (Utah 1984))).

Applying these principles to the instant case and assuming that Thiokol's suppliers owed tort duties which they breached, we hold that Thiokol's tort claims fail for the same reason that its warranty claim failed: it was unable to prove that any defect in the design or manufacture of tank T33 proximately caused the August 24th failure. The trial court specifically noted contrary testimony on causation: namely, that Fiberglass Structures failed to properly design, engineer, manufacture, or test the tanks and that these failures contributed to the failure of tank T33. However, the trial court ruled against Thiokol on its breach of warranty claim because it found that Thiokol caused the August 24th failure by overfilling tank T33. We read this as a factual determination that Thiokol's misuse of tank T33 exceeded the fault, if any, of its suppliers. Otherwise, the trial court would have apportioned damages on Thiokol's breach of warranty claim. *See Interwest Constr.*, 886 P.2d at 98–100 (affirming award of no damages on Thiokol's breach of warranty claim).

Accordingly, this finding also defeats Thiokol's strict liability and negligence claims, because they are premised on the same conduct and resulted in the same alleged damages as the breach of warranty claim. *Jacobsen Constr. Co. v. Structo–Lite Eng'g, Inc.*, 619 P.2d 306, 312 (Utah 1980). We thus disapprove of the reasoning employed by the court of appeals to affirm the trial court's ruling but affirm the result reached by both courts.

We now turn to Thiokol's claim that the court of appeals erred in holding that Thiokol waived its rights to enforce the terms of its original contract with Interwest with respect to the repaired tanks. Thiokol insists that its original contract with Interwest incorporated the requirements of NBS/PS 15–69, a national voluntary standard for fiberglass tanks and fittings. Thiokol additionally claims that the standard, and therefore the contract, called for a wall thickness greater than 1/4 inch and a safety factor of 10 to 1, while the modified tanks had walls of 1/4 inch and a safety factor of 6 to 1.[3]

We first note that the trial court concluded that the "NBS/PS 15–69 standards were not incorporated into the contract by Thiokol with sufficient clarity in the contract for the designer and manufacturer to be aware of their application; specifically with respect to wall thickness and safety factors."

The court of appeals, in turn, initially affirmed the trial court's finding that there was no breach of contract because Thiokol's suppliers "built and supplied the tanks in accordance with the terms of the contract." *Interwest Constr.*, 886 P.2d at 97. The court of appeals then began its waiver analysis. The court first noted, without analysis, that the NBS/PS 15–69 standard imposed minimum wall thickness dimensions and a safety factor of 10 to 1 and that the tanks did not meet these alleged requirements. *Id.* at 97 & nn. 6–7. Then the court of appeals concluded that even if the contract incorporated the NBS standard, Thiokol had waived its right to insist that the tanks conform to the wall thickness and safety factor the standard allegedly required. *Id.* at 98. The court

---

**3.** Thiokol also claims that the woven roving in the tanks' structural laminate layer overlapped by 1/4 inch rather than the one-inch overlap that NBS/PS 15–69 calls for and that the tensile strength of the tanks was insufficient. However, the trial court specifically rejected this version of the facts, finding that Thiokol presented inconclusive evidence to prove either of these points. Thiokol failed to challenge the trial court's factual findings before the court of appeals. *Interwest Constr.*, 886 P.2d at 96 ("Thiokol does not challenge the trial court's factual findings."). We therefore refuse to address them in this opinion. *Butterfield v. Okubo*, 831 P.2d 97, 101 n. 2 (Utah 1992). To the extent that the court of appeals recited the trial court's findings incorrectly, *see Interwest Constr.*, 886 P.2d at 97 n. 7, we vacate that portion of its opinion.

reasoned that because Thiokol approved Fiberglass Structures' proposed design for remedying the defective tanks, supervised their reconstruction, "and accepted the tanks although aware that they were not constructed in accordance with NBS/PS 15–69," Thiokol waived its right to claim that the modified tanks were deficient because they failed to meet the design or construction specifications allegedly incorporated into the original contract. *Id.*

Thiokol argues that the court of appeals' waiver analysis cannot survive legal scrutiny because (i) the NBS/PS 15–69 standard was a material term of the contract which cannot be waived; and (ii) an intentional waiver did not occur because Thiokol never knew the tanks did not meet the NBS/PS 15–69 specifications until after the August 24th failure; and (iii) by allowing Fiberglass Structures to repair and replace the three tanks after the first failure on April 30th, Thiokol was merely permitting that supplier to cure its deficient performance, and such cure cannot, as a matter of law, abrogate Thiokol's rights to demand full performance under the original contract. Thiokol notes that if left uncorrected, the court of appeals' waiver analysis threatens to encourage litigation by deterring contracting parties from attempting to cure defective contract performance.

We reject the premise advanced by Thiokol and assumed by the court of appeals that the contract incorporated minimum wall thickness dimensions and a 10 to 1 safety factor by virtue of the reference to the NBS/PS 15–69 standard. Thiokol concedes that the trial court expressly found that the contract did *not* incorporate such requirements but claims that the court of appeals found that it did. Thiokol contends that the court of appeals could do so because whether the original contract incorporated the NBS/PS 15–69 standard presents a question of law which an appellate court can correct without giving deference to the trial court's findings and conclusions.

However, both Thiokol and the court of appeals have misconstrued the issue in this case. We do not read the trial court's finding as rejecting the incorporation of the NBS/PS 15–69 standard into the contract, but as a finding that the standard did not mandate tank walls thicker than 1/4 inch and a safety factor of 10 to 1 so as to make these required terms of the contract. Our reading is supported by the fact that the trial court did consider whether tank T33 met NBS/PS 15–69's unambiguous requirement that "all layers shall be overlapped a minimum of 1 inch" but found that Thiokol had not proven the existence of insufficient overlap. *See supra* note 3.

■ As we set forth below, under our reading, the trial court's finding that the contract's reference to the NBS/PS 15–69 standard did not mandate wall thickness or safety factor requirements is a factual finding which Thiokol has not properly challenged. Thiokol has therefore failed to meet its burden on appeal to " 'marshal the evidence in support of the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be against the clear weight of the evidence, thus making them clearly erroneous.' " *Hall v. Process Instruments & Control, Inc.,* 890 P.2d 1024, 1028 (Utah 1995) (quoting *A House & 1.37 Acres,* 886 P.2d at 538 n. 4) (additional citation omitted). "Absent such a showing, we 'assume[ ] that the record supports the findings of the trial court and proceed to a review of the accuracy of the lower court's conclusions of law and the application of that law in the case.' " *Id.* (alteration in original) (quoting *A House & 1.37 Acres,* 886 P.2d at 538 n. 4).

■ We first clarify the standard of review for interpretation of a contract. Determining whether a contract is ambiguous presents a threshold question of law, which we review for correctness. *Willard Pease Oil & Gas Co. v. Pioneer Oil & Gas Co.,* 899 P.2d 766, 770 (Utah 1995); *Winegar v. Froerer Corp.,* 813 P.2d 104, 108 (Utah 1991); *Fitzgerald v. Corbett,* 793 P.2d 356, 358 (Utah 1990). If a contract is unambiguous, a trial court may interpret the contract as a matter

of law, and we review the court's interpretation for correctness. *Willard Pease,* 899 P.2d at 770. "A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Winegar,* 813 P.2d at 108 (quoting *Faulkner v. Farnsworth,* 665 P.2d 1292, 1293 (Utah 1983)). Once a contract is found to be ambiguous, a court may consider extrinsic evidence to determine its meaning. *Id.* Determining the meaning of a contract by extrinsic evidence generally presents questions of fact for the trier of fact, whose findings we review deferentially. *Fitzgerald,* 793 P.2d at 358; *see also Plateau Mining Co. v. Utah Div. of State Lands & Forestry,* 802 P.2d 720, 725 (Utah 1990); John D. Calamari & Joseph M. Perillo, *Contracts* § 3–14 (3d ed.1987).

■ Applying the foregoing rules, we first look to the four corners of the contract itself to determine whether it is ambiguous. We conclude that while the contract unambiguously referred to the NBS/PS 15–69 standard, the term requiring the tanks to conform to the "applicable requirements of NBS/PS 15–69" made the precise meaning of the performance intended by the parties ambiguous. "Applicable" is defined as "[f]it, suitable, pertinent, related to, or appropriate; capable of being applied." *Black's Law Dictionary* 98 (6th ed.1990). The word "applicable" necessarily implies that (i) all the requirements of NBS/PS 15–69 apply; (ii) some requirements apply while others do not; or (iii) none of the requirements apply. We must therefore review the NBS standard to determine whether any of its provisions unambiguously mandate tank walls thicker than 1/4 inch and a safety factor of 10 to 1.

■ Our review of the NBS standard itself reveals that the standard does not unambiguously mandate a particular wall thickness or safety factor for the tanks. The standard spans eighteen pages and covers materials, laminate properties, round and rectangular ducting, reinforced polyester piping, reinforced polyester tanks, inspection and test procedures, labeling, and so forth. As regards wall thickness, section 3.3.6 of the standard states, "[M]inimum wall thickness shall be as specified in the tables ..., but in no case shall be less than ... 3/16 inch in pipes and tanks regardless of operating conditions." Turning to table 7, which specifies minimum wall thicknesses for vertical cylindrical tanks like those at issue here, we find that the table does not include dimensions for tanks greater than 12 feet in diameter, and tanks T32, T33, and T34 were each 20 feet in diameter. Table 7 also notes that its figures are "[b]ased on a safety factor of 10 to 1 ... and a liquid specific gravity of 1.2." The NBS standard does not include a formula for calculating wall thickness for tanks of different sizes than those included in table 7, for different safety factors, or for liquids with different specific gravities.

Moreover, as regards safety factors, the NBS standard does not state anywhere that a 10 to 1 safety factor is "the recognized industry" standard, contrary to the unsupported assertion of the court of appeals, *Interwest Constr.,* 886 P.2d at 97 n. 6, or that this safety factor is required in all fiberglass tanks. Other tables in the standard for tanks, pipes, ducts, and flanges are based on different safety factors, and we have found no formula or recommendation regarding selection of a mandatory safety factor. Further, we do not read table 7 as specifically requiring a safety factor of 10 to 1, but as merely stating the assumptions upon which its wall thickness specifications for standard-sized tanks rest.

In short, the word "applicable" in the contract, coupled with the lack of specificity within the NBS standard, renders the contract ambiguous with respect to the thickness of the tank walls and a specific safety factor without resort to extrinsic evidence. The trial court apparently also found the contract provision ambiguous, as evidenced by its consideration of extrinsic evidence to clarify the contract's meaning. Whether the standard mandated a minimum wall thickness and a safety factor of 10 to 1 was hotly contested at trial. After hearing the evidence, the trial

court found as a matter of fact that the contract, as drafted by Thiokol, did not impose the minimum wall thickness and safety factor requirements that Thiokol claims were mandated by the NBS/PS 15–69 standard.

■■■ Thiokol failed to marshal the evidence in support of the trial court's factual finding before the court of appeals, and so that court should have presumed that the trial court's finding was correct. *Hall,* 890 P.2d at 1028. An appellate court does not " 'set aside the trial court's factual findings unless they are against the clear weight of the evidence or [the appellate court] otherwise reach[es] a definite and firm conviction that a mistake has been made.' " *Sweeney Land Co. v. Kimball,* 786 P.2d 760, 761 (Utah 1990) (quoting *Western Kane County Special Serv. Dist. No. 1 v. Jackson Cattle Co.,* 744 P.2d 1376, 1377 (Utah 1987)). "This standard of review applies equally to the Court of Appeals." *Id.; see also Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991). In short, the appeals court should have deferred to the trial court's factual finding regarding the meaning of the contract in light of its facial ambiguity and should have presumed the correctness of the finding, given Thiokol's failure to properly challenge it on appeal.

■■■ In light of the foregoing, the court of appeals' waiver analysis was irrelevant and superfluous because it proceeded from an incorrect factual assumption. In contrast to the court of appeals, the trial court found that the NBS/PS 15–69 standard did not mandate a minimum wall thickness greater than 1/4 inch or a safety factor of 10 to 1. A contracting party cannot be said to waive a term that was never part of the contract. Because the NBS/PS 15–69 standard did not mandate a particular wall thickness or safety factor, Thiokol could not waive these "terms." However, under the same reasoning, Thiokol cannot now claim that its suppliers failed to adhere to these "terms" and therefore breached their contracts.

Accordingly, we are left with the trial court's factual finding that "the tanks were built pursuant to the design specifications mandated by Thiokol in the contract," and the court of appeals' affirmance, based on that finding, of the trial court's conclusion that there was no breach of contract. *Interwest Constr.,* 886 P.2d at 97. Therefore, we disapprove of that portion of the court of appeals opinion which held that Thiokol waived its right to enforce the terms of its original contract with Interwest but affirm that court's conclusion that there was no breach of contract.

In sum, we hold that Thiokol's contract with Interwest did not preclude Thiokol's claims for negligence and strict liability but that those claims fail as a matter of law because Thiokol caused the August 24th failure of tank T33. We also hold that waiver is inapplicable to Thiokol's breach of contract claim, because the contract provision the court of appeals found Thiokol to have waived did not mandate a minimum wall thickness greater than 1/4 inch or a 10 to 1 safety factor as Thiokol claims. However, we affirm that court's ultimate conclusion that Thiokol's suppliers did not breach the contract.

HOWE and DURHAM, JJ., and HARDING, Judge, concur in Chief Justice ZIMMERMAN'S opinion.

STEWART, Associate C.J., concurs in the result.

Having disqualified himself, RUSSON, J., does not participate herein; RAY M. HARDING, Sr., District Judge, sat.