# UNITED STATES COURT OF APPEALS

**Filed 8/16/96**

## TENTH CIRCUIT

---

BECK'S OFFICE FURNITURE AND
SUPPLIES, INC., a Utah corporation;
JAMES F. BECK and CAROLINE
BECK,

      Plaintiffs-counter-defendants -
      Appellees,

v.

HAWORTH, INC., a Michigan
corporation,

      Defendant-counter-claimant -
      Appellant.

No. 95-4018
(D.C. No. 90-CV-472)
(District of Utah)

---

BECK'S OFFICE FURNITURE AND
SUPPLIES, INC., a Utah corporation,

      Plaintiff-counter-defendant -
      Appellant,

and

JAMES F. BECK and CAROLINE
BECK,

      Plaintiffs-counter-defendants,

v.

No. 95-4029
(D.C. No. 90-CV-472)
(District of Utah)

HAWORTH, INC., a Michigan
corporation,

      Defendant-counter-claimant -
      Appellee.

## ORDER AND JUDGMENT [*]

Before **SEYMOUR**, Chief Judge, **ALARCÓN**[**] and **LUCERO**, Circuit Judges.

Haworth, Inc., an office furniture manufacturer, appeals from a jury verdict in favor of one of its terminated dealers, Beck's Office Furniture, Inc. ("Becks"). Becks, which was awarded $625,000 by the trial court, cross-appeals the district court's refusal to award prejudgment interest and issues relating to its refusal to allow the jury to consider a punitive damages award against Haworth.

## BACKGROUND

Becks began selling Haworth systems furniture in 1981. "Systems furniture" is modular panel furniture and structures used to partition open rooms into compartmentalized working areas. The parties' relationship is governed by a Dealer

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] Honorable Arthur L. Alarcón, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

Agreement, executed in 1983 and terminable at-will by either party. The Dealer Agreement specifically allowed Haworth to sell systems furniture directly to a customer, although it also promised to "whenever possible include dealer participation as a servicing dealer on these projects." The servicing dealer would be entitled to a commission on these sales, referred to as a "dealer service fee." The dealer agreement also included a listing of services dealers could use, stating that "[i]n addition to our product line, we provide many services and aids to our dealers. Our policy is to make readily available to you the tools that will help you be successful." Becks alleged that Haworth representatives promised, in what it describes as a "gentlemen's agreement," to prefer authorized dealers in a territory for purposes of being named servicing dealer on a project. It also alleged that the agreement was further modified to establish that authorized dealers who made initial contact with customers were entitled to be named the servicing dealer if the customer was later sold systems furniture directly by Haworth. The jury found that both these terms modified the Dealer Agreement though a course of performance by the parties.

Sometime around 1987, Becks and Haworth began having difficulties with one another. Haworth allowed another office furniture dealer, Commercial Contract Group ("CCG"), to act as servicing dealer on a number of large projects, even though CCG was not then an authorized dealer. It also allegedly began undercutting Becks's ability to bid on a number of these projects, preferring CCG. In 1990, Haworth terminated Becks as a

dealer, Becks folded its business and brought this suit, claiming breach of contract, as well as other tort and antitrust claims, and asked for compensatory and punitive damages.

At the close of Becks's case-in-chief, Haworth requested a judgment as a matter of law, the request was granted on a number of Becks's claims, including the claim for punitive damages and infliction of emotional distress, but denied as to the breach of contract and tortious interference claims. At the end of its case, Haworth did not renew its motion, but apparently, in a conference on jury instructions, did challenge the sufficiency of the evidence and request that Becks's claims not go to the jury. The trial court allowed the breach of contract and tortious interference with prospective economic relations to go to the jury, instructing however that if the jury found breach of contract it need not decide the tortious interference claim. On a special verdict form, the jury found for Becks on breach of contract, and for Haworth on wrongful termination. It awarded damages of $625,000, representing the lost value of Becks as a business. Subsumed within this award was a finding of $500,000 in lost profits. The lost profits involved dealer service fees that Haworth paid to CCG, which Becks claimed should have been awarded to it based on its authorized dealer relationship with Haworth. After the verdict was returned, Haworth requested a JMOL, a new trial, and a remittitur, all of which were denied by the district court.

On appeal, Haworth raises six issues. First, the terms in the dealer agreement allegedly breached were too indefinite to create an obligation on Haworth's part. Second,

Becks failed to prove that Haworth's actions caused Becks damages because it presented no evidence that it would have made the sales and, in any event, Becks would have gone out of business even if it had received the $500,000 in fees. Third, the jury improperly awarded damages based on gross, not net profits. Fourth, $500,000 exceeds even the gross profits allegedly lost by Becks. Fifth, the $625,000 award, representing the value of Becks business before Haworth's alleged breach, is unsupported by any competent evidence. Sixth, Haworth is entitled to a new trial because of the trial judge's improper behavior during Haworth's cross-examination of Becks's principal witness.

In its cross-appeal, Becks raises three issues. First, it appeals the trial court's denial of prejudgment interest on its damages award. Second, it argues that the district court improperly directed verdict against it on its punitive damages claim. Finally, it asserts that the trial court erred in excluding a number of its witnesses, former dealers of Haworth who would have testified about the manufacturer's past practices.

## DISCUSSION

### I. HAWORTH'S CLAIMS ON APPEAL

As a threshold matter, Becks raises a procedural defense to many of Haworth's issues on appeal. It argues that because Haworth failed to renew its motion for judgment as a matter of law (JMOL) at the close of all the evidence, it waived its right to appeal the jury findings on these issues. The 1991 amendment to Fed. R. Civ. P. 50, allowing parties to move for judgment as a matter of law, replaces the earlier terminology of

directed verdicts and judgments notwithstanding the verdict. A JMOL motion "may be made at any time before submission of the case to the jury." Fed. R. Civ. P. 50(a)(2). A renewed JMOL can be made after a jury verdict if the earlier JMOL was denied. Fed. R. Civ. P. 50(b). Only questions raised before the verdict may be pursued after the verdict, and claims waived will not be entertained on appeal. Dow Chem. Corp. v. Weevil-Cide Co., Inc., 897 F.2d 481, 486 (10th Cir. 1990) (using old terminology). Although the general rule is that a JMOL motion denied before the close of evidence must be renewed at the end of the evidence or is waived--even if the trial court erred initially in denying the motion, see 9A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2534 (1995), the harsh results of such a waiver counsel that "technical precision" in complying with the rule is unnecessary. Anderson v. United Tel. Co., 933 F.2d 1500, 1503 (10th Cir.), cert. denied, 502 U.S. 940 (1991). As long as the trial court was aware of the movant's position at the end of presentation of evidence, we liberally construe the JMOL for purposes of renewing it after a verdict has been returned. Aguinaga v. United Food & Comm. Workers Int'l Union, 993 F.2d 1463, 1470 (10th Cir. 1993), cert. denied, 510 U.S. 1072 (1994).

In this case, while Haworth did not formally renew its JMOL motion at the conclusion of the evidence, it made the court aware that it did not believe the evidence was sufficient to send the case to the jury because of the indefiniteness of the contract, the lack of proof of causation, and lack of proof of damages. The JMOL and motion for a

new trial also were based on these theories. Haworth adequately preserved its claims that it is entitled to judgment as a matter of law.

## A. LIABILITY

### 1. Whether the Dealer Agreement between Becks and Haworth was too Indefinite to Constitute a Binding Obligation that Haworth Could Breach?

We review the denial of a JMOL motion de novo, applying the same standard as the district court. Sheets v. Salt Lake County, 45 F.3d 1383, 1387 (10th Cir.), cert. denied, 116 S. Ct. 74 (1995). Under this standard we find error in denial of such motion "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'" FDIC v. United Pacific Ins. Co., 20 F.3d 1070, 1079 (10th Cir. 1994) (quoting Ralston Dev. Corp. v. United States, 937 F.2d 510, 512 (10th Cir. 1991)).

Haworth's claim is that its obligations under the Dealer Agreement were too vague to support an enforceable obligation to provide Becks specific services or to choose it as "servicing dealer" on projects in which Haworth sells directly to the customer. The meaning and effect of a written instrument is a question of law which is reviewed for correctness. Willard Pease Oil and Gas Co. v. Pioneer Oil and Gas Co., 899 P.2d 766, 770 (Utah 1995). When, however, contract provisions are uncertain, extrinsic evidence is admissible to explain the parties' intent. Faulkner v. Farnsworth, 665 P.2d 1292, 1293 (Utah 1983). Indeed, the Dealer Agreement is written in very vague terms, incorporating

obligations such as "our policy is to make readily available to you the tools that will help you be successful," and "[w]e will whenever possible include dealer participation as a servicing dealer on [projects Haworth sells products directly to the end customer]." In fact, the Dealer Agreement only purports to be a "document [that] sets forth the major guidelines of the working relationship between Haworth and our dealers." Under Utah law, "[a] condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced." Pingree v. Continental Group of Utah, 558 P.2d 1317, 1321 (Utah 1976) (quoting Valcarce v. Bitters, 12 Utah 2d 61, 63 (1961)). On the other hand, the jury found that the Dealer Agreement's vague provisions were fleshed out through a several-year course of performance between Becks and Haworth, giving rise to the aforementioned "Gentleman's Agreement." [see special interrogatories Nos. 36, 46, 56] Moreover, the jury found Haworth liable for breach of the implied covenant of good faith and fair dealing in the Dealer Agreement.[1]

Utah recognizes that every contract contains an implied covenant of good faith and fair dealing, and that a party can breach the covenant by wrongfully exercising the

---

[1] The Dealer Agreement contained an integration clause, stating, "This is our complete agreement. Any changes or additions must be in writing and signed by Haworth." Nevertheless, the court allowed the question of additional terms go to the jury, presumably under the exception to integration clauses allowing consistent additional terms to modify the contract, and to allow course of performance and course of dealing to explain or supplement the writing. Procon Corp. v. Utah Dep't of Trans., 876 P.2d 890, 894 (Utah App. 1994). Cf. U.C.C. § 2-208.

discretion given it by the contract.  Olympus Hills Shopping Center v. Smith's Food &

Drug Center, Inc., 889 P.2d 445, 450 & n.4 (Utah App. 1994), cert. denied, 899 P.2d

1231 (Utah 1995).  The question of whether a party has breached the covenant is a

question of fact.  Beck v. Farmer Ins. Exchange, 701 P.2d 795 (Utah 1985).  Essentially,

the covenant protects parties' reasonable expectations in the contract.  Olympus Hills, 889

P.2d at 450-51.  Utah, however, has declined to extend the covenant to at-will

employment contracts, reasoning that an implied covenant cannot be used to alter the

rights agreed upon by the parties.  Hodgson v. Bunzl Utah, Inc., 844 P.2d 331, 335 (Utah

1992).  Still, the right to terminate the contract at-will does not vitiate a party's

expectations while the contract remains in force.  See Big Horn Coal Co. v.

Commonwealth Edison Co., 852 F.2d 1259, 1267-68 (10th Cir. 1988) (although one party

might have the unfettered right to terminate the contract and needs no reason to invoke

the provision, all discretionary provisions generally are subject to good faith obligations).

While the terms in the written dealer agreement themselves may not have given

rise to enforceable obligations with regard to Haworth's duty to help Becks win project

sales in its territory, or to prefer it to nondealers, or to award it dealer service fees, the

jury was entitled to find consistent implied terms creating these obligations.  Kent Poole,

Haworth's Salt Lake City market manager, created policies for Haworth dealers in his

territory.  Poole allegedly led Becks to understand that Haworth would support the sales

effort of the dealer who first contacted a new account or project, and protect that dealer

from encroachment by other Haworth dealers.  In connection with this practice, Haworth dealers in Poole's territory would be required to "register" accounts they initially contacted.  Poole also represented that Haworth would always support an authorized dealer over one who had a more limited "buy-sell" relationship with Haworth. Substantial evidence supports the conclusion that through a course of performance this "Gentleman's Agreement" became part of the Dealer Agreement between Haworth and Becks. [Becks App. 15-18, 24-27, 132-32 138, 180, 185-92, 207-210, 345-46, 364]

Substantial evidence also supports the jury's finding that Haworth breached the implied covenant of good faith and fair dealing in the manner it preferred CCG, a nondealer, to Becks, and in the manner it failed to support Becks's efforts to win the projects on which it claims lost profits. [Becks App. 40-59, 139-45, 169, 171-176, 220-54, 362-70]   Even if the at-will exception to enforcing the implied covenant extends beyond employment contracts, it is still inapplicable in this context, where the claimed breach is not Becks's termination, but actions Haworth took before it terminated Becks.

Becks argues that Haworth undermined Becks's ability to receive servicing dealer fees on five separate projects that Haworth sold directly, or otherwise failed in its commitments to Becks with respect to these projects. On the 3M project, Becks argues that Haworth failed to support it as the first dealer to register 3M as a customer and failed to assist it in Becks's attempt to bid the project.  On the Novell project, Haworth also failed to assist Becks and, particularly, failed to communicate information critical to

Becks's ability to secure the bid. On the Hill Air Force Base project, Haworth failed to use Becks, the first dealer with respect to the customer, as the servicing dealer on the project. On the West Valley City project, Haworth again allegedly breached the Gentleman's Agreement by favoring CCG over Becks, despite Becks's status as the authorized dealer. On the Dugway project, Becks presented evidence that Haworth breached its commitment to prefer authorized dealers over those merely in a buy/sell arrangement. Not surprisingly, Haworth disputes that its action constituted breaches with respect to any of the project. Reviewing the record and reasonable inferences therefrom in the light most favorable to the jury's verdict, sufficient evidence exists to support the conclusion that Haworth breached its obligations to Becks.

> **2. Whether Becks Presented Sufficient Evidence That Haworth's Breach Caused Becks's Damages, Including Damages Stemming From the Lost Value of Becks Business?**

Haworth next argues that even if the Dealer Agreement was definite enough to enforce, and even if Haworth did breach its duties or covenant under the contract, its breach was not the cause of Becks's losses because Becks did not present evidence that it would have won the contested projects even had Haworth complied. Haworth further argues that even if Becks had been awarded all of the dealer service fees it claims, Becks was in such bad financial condition its insolvency was inevitable. The actual cause of Becks's demise, Haworth argues, was its bank's withdrawing its line of credit, and that would have occurred even had Becks been awarded the dealer service fees. On this latter

point, Haworth emphasizes that it was contractually entitled to terminate Becks and this termination caused the bank to cut off Becks's financing.

### a. Whether Haworth's Breaches Caused Becks to Lose Dealer Fees?

At trial, Becks presented evidence that projects that should have gone to Becks went instead to CCG as a result of Haworth's breaches of the Dealer Agreement. Dealer servicing fees that Haworth paid to CCG were rightfully Becks's, according to this theory of the case. These diverted dealer fees represented lost profits. Becks presented evidence of these fees through its expert Christopherson. The special interrogatories answered by the jury did not ascribe damages directly from fees arising out of lost projects, however. Instead, the jury found that Becks suffered $150,000 in damages from breach of Haworth's obligation to provide "field or corporate sales support and assistance" (Interrogatory #4); $75,000 from breach of its obligation to "include [Becks] as a servicing dealer" (Interrogatory # 10); $75,000 from Haworth's failure to honor the "Gentleman's Agreement" of recognizing Becks's right to pursue customers it first contacted and discouraging other dealers from pursuing those customers (Interrogatory # 43); $50,000 from Haworth's breach of its obligation not to misuse confidential information regarding potential customers (Interrogatory # 63); and, $150,000 for the breach of the implied covenant of good faith and fair dealing (Interrogatory # 79).

Haworth contends that at three of the five lost projects (Novell, 3M, West Valley City Project), its breaches of the Dealer Agreement were not the cause of Becks' failing

to secure the dealer fees that represent the starting point for calculating lost profits. After reviewing the record as a whole, we disagree. The jury could have reasonably found that had Haworth not breached the Dealer Agreement, the covenant of good faith and fair dealing, and the additional terms created by a course of performance between the parties, Becks would have won the disputed projects and been entitled to the dealer fees. [Becks App. 53-59, 78-80, 134-35, 168-74 234-36, 244-47, 286-311, 362-63, 368-70]  If we can conform the jury's answers to special interrogatories to the evidence presented at trial, we will uphold the verdict. Furr v. AT&T Technologies, Inc., 824 F.2d 1537, 1545 (10th Cir. 1987). Here, substantial evidence produced at trial supports finding that Haworth's breaches caused Becks to lose the servicing dealer fees. Although the jury verdict does not demonstrate the liability in the most artful manner, it supports some amount of damages for the loss of each of the five projects lost because of Haworth's breaches.

### b. Whether Haworth's Breaches Caused Becks to Fail?

Becks was awarded $625,000 for the diminution of its business rather than an amount of lost profits. The jury specifically found that the combined effect of damages in lost profits caused by Haworth's breaches made Becks's business fail. Interrogatory # 82. Haworth argues that even given the alleged lost profits, its breaches did not cause Becks to go out of business. Rather, it argues that the cause of Becks's business failure was its bank withdrawing Becks's line of credit, which was caused not by the lost profits Becks suffered, but by Haworth terminating Becks as a dealer.

- 13 -

Considerable evidence supports Haworth's theory. On the other hand, we must uphold the verdict unless "the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." United Pacific, 20 F.3d at 1079. Christopherson, Becks's expert witness, testified that he believed the business would have survived if it had received an additional $388,000 from the five diverted projects. [Haw. App. A629-630, 636; Becks App. 316, 334-343, 375-77] Christopherson was qualified to opine on this subject, and it was not an abuse of discretion to admit Christopherson's opinion. It is not our role to second-guess the jury's determination of the facts when admissible evidence exists to support it. We conclude that given the amount of lost profits supported by the evidence, see infra section I.B.2, the jury could make an inference that an infusion of more than $360,000 would have allowed Becks to remain in business.

## B. DAMAGES

### 1. Is the Award of $625,000 for Diminution in the Value of Becks Business Supported by the Evidence?

The jury found that before Haworth's breach Becks was worth $625,000, and after the last of the breaches it had no value, and also that the combined effect of damages from Haworth's breaches caused Becks to fail. Because the trial court awarded the diminution of value in the business as damages, it never awarded lost profits separately, finding them subsumed within the diminution of value award. Haworth argues that the jury finding of $500,000 for lost profits far exceeds what the evidence presented would

- 14 -

allow, and that if we find the lost profit assessment unsupported we must likewise find the diminution calculation unsupported, or at least reduce the damage award to the amount supportable. Becks argues that if there is a way to make the special interrogatories consistent we should adopt that view and uphold the jury verdict. Furr, 824 F.2d at 1545. We conclude that no competent evidence supports the figure of $625,000 in diminution of value.

The value of Becks before the breaches was based entirely on expert witness testimony by Christopherson and lay testimony by James Beck. Haworth argues that the $625,000 remains unsupportable because the only evidence Becks presented was that of Christopherson and James Beck, the principal of the company, and that both of their opinions relied exclusively on unsigned reports by the Geneva Group, a business broker, the author of which never testified. Both Beck and Christopherson valued the company in the range of $900,000-$1.1 million. Haworth argues that the Geneva report was itself speculative and that neither Christopherson nor Beck ever tested the report's assumptions. Under Fed. R. Evid. 703, an expert may rely on "facts or data . . . perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." In this case, the trial court apparently found that a CPA could reasonably rely upon the Geneva report in forming his opinions.

This court reviews the trial court's determination of whether expert testimony should be admitted under the abuse of discretion standard. United States v. Rice, 52 F.3d 843, 847 (10th Cir. 1995). An expert opinion must be based on facts that enable the expert to "express a reasonably accurate conclusion as opposed to conjecture or speculation but absolute certainty is not required." Kieffer v. Weston Land, Inc., No. 95-8046, 1996 WL 411664 at *2 (10th Cir. July 23, 1996) (quotation and brackets omitted). Experts are allowed to rely on hearsay, and even on the opinions of others if proper foundation was laid that others in the field would likewise rely on them, but may not merely parrot the opinions of other experts whose conclusions are not themselves in the record. Tk-7 Corp.v. Estate of Barbouti, 993 F.2d 722, 732-33 (10th Cir. 1993) (excluding expert opinion relying on another expert's report because witness failed to demonstrate a basis for concluding the report was reliable and showed no familiarity with methods and reasons underlying the hearsay report).

In this case, Christopherson admitted that the Geneva reports were unreliable to determine the value of the business[2] and that without the reports he would have been unable to give any figure for the value of the business. [Haw. App. A 606-09] The

---

[2] In response to the question of whether the Geneva reports were of the type reasonably relied on by experts in valuation, Christopherson replied: "When you say relied upon, it is used as a basis, yes, but in and of themselves, no, because you have to do a certain amount of your own work. That's why I said this was never a formal evaluation that we did with regard to Beck's. Because it wasn't -- we probably relied more on what they did, although we did go into the theory." Haw. App. A604 (emphasis added).

- 16 -

numbers underlying Christopherson's opinion were merely an averaging of the two Geneva reports, reports that were prepared by business brokers. [Haw. App. A626] The question of this case is not whether Christopherson was entitled to rely on the Geneva reports in order to formulate his own opinion; Christopherson simply did not provide an independent opinion of the value of the business. It was an abuse of discretion for the district court to allow Christopherson testify to his opinion of the value of Becks.[3]

Likewise, James Beck was allowed to testify as to the value of his business. The trial court correctly noted that an owner of a business may testify as to its value. Shane v. Shane, 891 F.2d 976, 982 (1st Cir. 1989). In this case, however, Mr. Beck candidly admitted that his opinion of the business was based entirely on the Geneva reports. The court abused its discretion in allowing this testimony.

Without the testimony of Christopherson and James Beck regarding their opinion of the business, no evidence supports a finding that Becks had any value as a business above that of their hard assets, which Christopherson testified had a value of about $220,000. The Geneva reports were never admitted into evidence, and Haworth's expert, Dr. Randle, testified that as of the date of the first breach Becks had no value. Thus the jury finding that Becks had a fair market value of $625,000 in early 1988, Interrogatory #

_____

[3] While the trial court extensively examined Christopherson in order to help lay a foundation for his opinion on the value of the company, Christopherson's candid answers demonstrate that he had no opinion of Becks apart from the Geneva report. [Haw. App. 618-25] Moreover, we note that the trial court appeared to advocate Becks's position far better than the party's lawyers, an odd role for a neutral adjudicator.

84, is not supported by any competent evidence and may not stand. Nevertheless, the jury also awarded Becks a total of $500,000 in lost profits, and the trial court specifically found that this award was supported by sufficient evidence.

**2.      Whether the Jury Mistakenly Awarded $500,000 in Lost Profits Based on Gross Rather than Net Profits?**

The jury found that Becks's total lost profits from Haworth's breach of the Dealer Agreement amounted to $500,000. The evidence admitted tended to show that the gross servicing dealer fees Haworth paid CCG on the disputed projects at most only amounted to $408,904, although through arithmetic and logical miscalculations not contested on appeal by Becks, Becks argues that lost profits for the five disputed projects amounted to $504,489.30.[4] The bulk of Becks's lost profits evidence came from its expert, Christopherson, who took the gross fees paid to CCG and subtracted 10% as expense and overhead, a figure Haworth contends is arbitrary and unsupportable. Becks argues that the 10% figure is justifiable considering that most of the relevant expenses and overhead had already been expended. Becks defends the award in excess of the amount its expert

_____

[4] Christopherson calculated Becks' lost gross profits from credit invoices CCG claimed from the disputed projects. These invoices were admitted into evidence. In its opening brief, Haworth pointed out that Christopherson's figure overstated by $95,586 the amount of credit invoices from the disputed projects. In its response brief, Becks does not contend that Christopherson had not made the claimed arithmetic errors; rather, it argues that Haworth did not adequately explain the shortcomings to the jury. It thus appears that Becks concedes Christopherson was mistaken in adding up the relevant credit invoices. Awarding them as lost profits would provide Becks a windfall to which it is not entitled.

- 18 -

calculated by arguing that it presented evidence of lost profits from fees improperly paid to CCG, but that it was unable to quantify the losses because Haworth failed to turn over documents for Christopherson to analyze.

Damages must be proven with reasonable certainty, though not necessarily by a precise estimate. Atkin Wright & Miles v. Mountain States Tel. And Tel. Co., 709 P.2d 330, 336 (Utah 1985). Under Utah law, a party is only entitled to recover lost net profits--that is, lost gross profits minus expenses associated with acquiring such profits. Sawyers v. FMA Leasing Co., 722 P.2d 773, 774 (Utah 1986). A mere showing of lost gross profits does not afford a jury the basis to award lost profits with reasonable certainty. First Sec. Bank v. J.B.J. Feedyards, Inc., 653 P.2d 591, 596 (Utah 1982).

Haworth challenges the lost profit findings on the basis of Christopherson's testimony and on the deviance of the award even from his opinion. In challenging the 10% discount, Haworth argues that Christopherson had no basis to come to this figure, and that all of the evidence in the record contradicts his conclusion. See SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 968-69 (10th Cir. 1994) ("'When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.'") (quoting Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993)), cert. denied, 115 S. Ct. 2600 (1995). Visa USA and Brooke Group, both of which are antitrust cases involving determinations of the relevant market,

cannot easily be extended to this context. Reasonable certainty requires some supporting evidence of overhead expense or other costs from which a net figure can be derived. Sawyers, 722 P.2d at 774 (upholding directed verdict for defendant where plaintiff presented only evidence of gross profits); Canyon Country Store v. Bracey, 781 P.2d 414 (Utah 1989)(amount of lost profits are too speculative where no contracts were entered into and expert witness calculated lost profits based on hypothetical number of customers). Here, it appears that Becks did present some evidence from which the jury could have supported the 10% deduction, including reviewing Becks's past financial data, and interviews with James Beck and other employees of the business.[5] [Haw. App. A 680-82] Christopherson explained that reducing the gross profits by ten percent was a reasonable approach in this case because most of the overhead costs of handling the projects had already been expended, including draws against salary by Becks salespeople. Moreover, Becks's figures used by Christopherson in reaching his opinion derive from actual payments made by Haworth to CCG on the disputed projects. Sufficient evidence supports Christopherson's opinion that a ten percent deduction from lost gross profits would properly determine net lost profits.

The only evidence to support the $500,000 figure involves speculation that the jury considered earlier lost profits that were not quantified and extrapolated the same ten

---

[5] Haworth contends the evidence constitutes inadmissable out of court statements that Christopherson could not reasonably rely on. Unlike his reliance on the Geneva report, the reliance on hearsay in this instance was permissible. See Fed. R. Evid. 703.

percent overhead deduction, as well as crediting Christopherson's improper figures of lost gross profits. The lost net profits supported by Christopherson's testimony only amounts to approximately $450,000. Becks argues that once plaintiff presents evidence of damages, the burden shifts to the defendant to rebut, citing Ault v. Dubois, 739 P.2d 1117 (Utah App. 1987). In Ault, however, the burden shifted once the plaintiff presented evidence that reasonably supported its claim. Id. at 1121. Here, no competent evidence supports finding more than $408,904 in gross lost profits. This amount must be reduced by ten percent to determine net lost profits. This totals $368,014.

After the jury verdict, Haworth moved for a new trial or, in the alternative, a remittitur, both of which were denied by the district court. In this case, where the evidence does support some amount of damages but not the amount the jury awarded, remittitur is proper. See Thompson v. Shelter Mut. Ins., 875 F.2d 1460, 1463 (10th Cir. 1989); K-B Trucking Co. v. Riss Int'l Corp., 763 F.2d 1148, 1162-63 (10th Cir. 1985). We conclude that the trial court abused its discretion in denying Haworth's motion for a remittitur. When the jury's award exceeds the amount established by the evidence, the appropriate remedy is to reduce the award "'to the outer limit of the proof.'" K-B Trucking, 763 F.2d at 1163 (quoting Goldstein v. Manhattan Indus. Inc., 758 F.2d 1435, 1448 (11th Cir.), cert. denied, 474 U.S. 1005 (1985)).

In this case, it is proper for us to remand to the district court with directions to enter an order offering Becks a judgment reducing the damage award against Haworth to

$368,014. Should Becks not accept the modified damage award, the court should order a new trial on the issue of damages. Should Becks seek damages for diminution of the value of its business--rather than damages from lost profits--it in addition must present evidence that the lost profits, properly calculated, caused the loss in the value of its business.[6]

## II. BECKS'S CROSS-APPEAL

### A. Did the Trial Court Abuse its Discretion to Deny Prejudgment Interest?

The district court denied Becks prejudgment interest on its award, finding that under Utah law the damages could not be calculated with mathematical certainty. *Judgment* at 3. We review the denial of prejudgment interest for an abuse of discretion. U.S. Indus., Inc. v. Touche Ross & Co., 854 F.2d 1223, 1255 n.43 (10th Cir. 1988). Because any damage award will be ascertained on remand and are awarded within the

---

[6] As a final issue in its appeal, Haworth contends that the trial judge improperly interfered with its cross-examination of plaintiff's main witness, James Beck. Apparently, the judge mistakenly believed that counsel had on cross examination already inquired into matters raised on direct examination and that the cross-exam had become repetitive. In his admonitions to counsel, the judge made some sharp references to Haworth counsel's behavior. The next day, the judge learned of his error, gave a corrective instruction to the jury, and allowed Haworth's counsel to engage in as much cross-exam of Beck as it desired. While it can be reversible error for the trial court to abuse its discretion and preclude entirely cross-examination of a witness, see SEC v. Peters, 978 F.2d 1162, 1172 (10th Cir. 1992), in this case the court's actions fell short of denying meaningful cross-examination and, in any event, the trial court adequately cured its error.

discretion of the trial court, we do not now reach this issue. Instead, we leave it to the trial court to determine whether such damages are appropriate given the nature of proof Becks presents.[7]

### B. Did the District Court Err in Directing a Verdict Against Becks on its Punitive Damages Claim?

Becks argues that the district court should not have granted Haworth's JMOL motion on its punitive damages claim because there was sufficient evidence of Haworth's misconduct to send the case to the jury. As noted above we consider motions for JMOL under the same standard as the trial court. The court analyzes a JMOL motion under the same standard as a motion for summary judgment, granting the motion only if there is no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law. Pendlton v. Conoco, 23 F.3d 281, 286 (10th Cir. 1994). In considering the motion, we are guided by the subsidiary evidentiary standard the nonmoving party must meet to prevail on its claim. See Anderson v. Liberty Lobby, 477 U.S. 242, 254-55 (1986).

Punitive damages are made available by statute under Utah law, and may be awarded "only if compensatory or general damages are awarded and it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of

---

[7] Even if Becks accepts the remittitur, it will be the district court's decision whether to allow prejudgment interest on the modified damages award. Until the district court decides whether or not to award prejudgment interest any decision by us would be premature.

willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code Ann. § 78-18-1(a) (1953) (emphasis added). Under Utah law, punitive damages should be awarded infrequently. Gleave v. Denver & Rio Grande R.R. Co., 749 P.2d 660, 670 (Utah App. 1988). By the terms of the statute and under Utah case law, punitive damages must be predicated upon tortious conduct. Canyon Country Store, 781 P.2d at 423. Breach of the implied covenant of good faith and fair dealing sounds in contract not tort. Id. Here, the only tort on which a punitive damages claim could have been predicated was interference with prospective business advantage. In fact, even this conduct might not be a predicate to punitive damages. See Jorgensen v. John Clay and Co., 660 P.2d 229, 232-33 (Utah 1983) (even a malicious or willful breach of contract cannot allow for a punitive damages award unless an independent tort is proved). It is not clear in this case whether the jury might have found a tort because it did not have to decide the issue once finding that damages from Haworth's breaches caused Becks to fail. [Haw. App. C848]

The trial court's conclusion that none of Haworth's actions could rise to the level of malicious or knowing indifference towards Becks's rights is not contradicted by the clear and convincing evidence in the record. First, almost no evidence was presented to demonstrate that Haworth believed it was interfering with project contracts it knew Becks was to receive. Second, the conduct giving rise to punitive damages must be proven by

- 24 -

clear and convincing evidence.  Even if Becks can argue that the jury might have reasonably inferred that Haworth acted maliciously and with knowing indifference to Becks's prospective business advantage, these inferences could not lead a reasonable jury to find the evidence was clear and convincing, particularly in light of the plausible legitimate reasons Haworth gave for abandoning Becks in favor of CCG.

**C.      Whether the Trial Court Erred in Excluding Testimony of Ex-Haworth Dealers?**

Finally, Becks contends that the trial court erred in excluding the testimony of former Haworth dealers.  These dealers would have testified on Haworth's prior bad acts, apparently in support of Becks's punitive damages and tort claims.  We review a district court's exclusion of evidence for an abuse of discretion, and do not disturb its determination "absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment."  Cartier v. Jackson, 59 F.3d 1046, 1048 (10th Cir. 1995).

Fed. R. Evid. 404(b) provides in part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."  In this case, Becks asserts that this testimony properly goes to Haworth's state of mind in its actions against Becks.  The Supreme Court has fashioned four requirements before Rule 404(b) evidence may be admitted:  (1) the evidence must be

offered for a proper purpose; (2) the evidence must meet the relevancy requirement of Rule 402; (3) the trial court must assess whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice under Rule 403; and (4) the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. Huddleston v. United States, 485 U.S. 681, 691-92 (1988). The trial court apparently found the risk of prejudice to Haworth substantially outweighed its probative value to Becks, and that to allow the ex-dealers testify would require a mini-trial to allow Haworth the opportunity to explain its reasons for terminating each dealership and its successful relations with other dealers. The district court properly followed Huddleston and its decision did not "manifest a clear error in judgment." See Coast-to-Coast Stores, Inc. v. Womack-Bowers, Inc., 818 F.2d 1398, 1403-04 (8th Cir. 1987) (affirming district court's exclusion of testimony by nonparty former franchisees in franchise termination case based on potential prejudice and immateriality).

## CONCLUSION

With respect to Haworth's appeal we AFFIRM the jury verdict on the liability of Haworth for breach of contract. We REVERSE AND REMAND the jury verdict on the issue of damages and order the district court to grant Haworth's motion for remittitur in the amount above stated. Should Becks refuse the remittitur and seek damages from diminution of value of its business, rather than damages from the lost profits themselves,

it must, in addition to proving lost profits, prove that the lost profits caused by Haworth's breach caused the value of its business to diminish, specifically, that the lost profits drove it out of business.

With respect to Becks's cross-appeal, we AFFIRM the district court in all respects.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge